2008 ME 180

**STATE of Maine**

v.

**John M. DOMINIQUE.**

Supreme Judicial Court of Maine.

Argued: Oct. 29, 2008.
Decided: Dec. 9, 2008.

Michael Povich, District Attorney, Mary Kellett, Assistant District Attorney, (orally), Ellsworth, ME, for the State.

Wayne Foote, Esq. (orally), Law Offices of Wayne Foote, Bangor, ME, for Defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, MEAD, and GORMAN, JJ.

LEVY, J.

[¶ 1] The State appeals from an order of the Superior Court (Hancock County, *Cuddy, J.*) granting in part John M. Dominique's motion to suppress evidence obtained inside an intoxilyzer room at the Bar Harbor police station. The State argues that: (1) statements made to the police officer by Dominique while in the room were admissible because they were not the result of interrogation; and (2) statements made by Dominique during a cell phone conversation commenced after the officer left the room, and recorded on a surveillance camera, are also admissible because there was no objective expectation of privacy in the police intoxilyzer room. We vacate the suppression order and remand for further proceedings.

## I. BACKGROUND

[¶ 2] On August 20, 2007, a police officer stopped John Dominique for generating excessive noise, in violation of 29–A M.R.S. § 2079 (2007), and riding a motorcycle with blue lights, in violation of 29–A

M.R.S. § 2054(2)(D) (2007). The officer subsequently determined that Dominique might be operating under the influence, arrested Dominique, and drove him to the Bar Harbor police station. Dominique was not given a *Miranda* warning.

[¶ 3] At the station, Dominique was placed in the room used by police to administer the intoxilyzer test (the intoxilyzer room). The room was equipped with video and recording devices. The record does not establish whether there were signs posted to that effect or if these devices were visible to persons in the room. The officer began setting up the intoxilyzer and explained that if Dominique tested lower than the legal limit, he could go back to his hotel. Dominique then stated, "It's not going to work though." The officer replied, "No?" Dominique then responded, "No, [be]cause I had two beers in an hour," and proceeded with an explanation of why he believed the test is affected by the type of beer a person drinks, and how he was familiar with the test because he had many family members who were police officers. While Dominique continued his explanation, the officer began setting up a computer and then proceeded with questions about Dominique's address, vehicle, and other information, which he typed on the computer's keyboard.

[¶ 4] After a series of biographical questions, the officer again began to explain the procedure for the test, at which point Dominique said, "I'm not going to blow into [the machine]," to which the officer replied, "You're not?" He then proceeded to retrieve the form Dominique would have to sign in order to indicate he had refused the test.[1] A few minutes later the officer asked:

---

1. In Dominique's view, the interrogation consisted of all statements he made in response to the officer's initial reply, "No?"

Officer: How much cash do you have on you?

Dominique: I don't know, a hundred bucks, that's it.

Officer: [Does] your brother have cash on him?

Dominique: Yes.

Officer: Does he have a cell phone or something you can call?

Dominique: Yes.

Officer: Why don't you give him a call and tell him you're going to need some bail money. I have a feeling it's going to be more than a hundred dollars where you're not from the state of Maine.

Dominique: How much?

Officer: I'm going to go find out right now. Just get a hold of him.

[Interrupted by third person who informs them that bail is set at five hundred and forty dollars.]

Dominique: Five hundred and forty dollars? You can't pay with a credit card?

Officer: Nope, it has to be cash. Give him a call and find out.

[¶ 5] Following their colloquy, the officer left the room. Dominique proceeded to call his brother and arranged for him to come down and bail him out. He then made another phone call during which he made additional statements about the number of beers he had consumed. After Dominique finished his second call, the officer came to the door and asked, "Did you get the five [hundred and] forty [dollars]?" To which Dominique replied, "Yeah, they're coming." The officer responded, "They've got cash though?" To which Dominique replied, "Oh yeah." A few minutes later, Dominique told the officer, "So I just called my dad," and the officer responded, "Yup." Dominique continued to explain to the officer, "and he's ... calling some state trooper," and the Officer replied, "Ok." Dominique then re-

sponded, "I don't know, I just told him ..." and again stated the number of beers he consumed and other information.

[¶ 6] Because the intoxilyzer room was equipped with recording and video devices, all of the conversations between Dominique and the officer, as well as the statements Dominique made during the telephone calls, had been recorded without his knowledge.

[¶ 7] The State subsequently charged Dominique with operating under the influence (Class D), 29–A M.R.S. § 2411(1–A)(C)(1) (2007). Dominique filed a motion to suppress all statements made during the course of his arrest and booking, arguing they were taken in violation of his constitutional rights. The court held a suppression hearing during which it heard testimony from the officer and later viewed the video recording of the intoxilyzer room. The court denied Dominique's motion to suppress, with the exception of those statements made by Dominique in the intoxilyzer room, finding that Dominique was in custody at that time and had not been informed of his rights. This appeal by the State followed.

## II. DISCUSSION

[¶ 8] We address, in turn, (A) the Fifth Amendment protection from compelled self-incrimination, (B) the Sixth Amendment right to counsel, and (C) the Fourth Amendment prohibition against unreasonable searches and seizures.

### A. The Fifth Amendment

■ [¶ 9] The Fifth Amendment provides, in pertinent part, "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. Thus, a "person who is in custody and subject to interrogation must be advised of the rights referred to

in *Miranda v. Arizona* [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] in order for statements made during the interrogation to be admissible against [him or] her ... at trial." *State v. Bridges,* 2003 ME 103, ¶ 23, 829 A.2d 247, 254 (citations omitted). Because the State does not contest that Dominique was in custody, "[t]he State thus bears the burden of establishing by a preponderance of the evidence that a *Miranda* warning was not required." *State v. Brann,* 1999 ME 113, ¶ 12, 736 A.2d 251, 255. The State argues that *Miranda* warnings were not necessary because when he made the statements to the officer, Dominique had not been subjected to interrogation. Instead, the State contends that these were voluntary statements made during an administrative procedure, and not in response to a custodial interrogation.

[¶ 10] The court's ruling on "a motion to suppress is reviewed in two different ways: the factual findings made by the trial court for clear error, and de novo for issues of law and for the ultimate determination of whether the statement should be suppressed." *State v. Lockhart,* 2003 ME 108, ¶ 15, 830 A.2d 433, 441.

[¶ 11] We note at the outset that in response to a request by the State for conclusions of law and findings of fact as to whether Dominique had been subject to interrogation, the Superior Court found, "at the time Mr. Dominique was being detained in the interrogation room of the Bar Harbor Police Department he made statements in the presence of the investigating police officer." Thus, the court did not explicitly address whether Dominique was subjected to interrogation and, for the reasons that follow, we conclude the court's findings considered in their totality do not support a determination that Dominique was subject to interrogation.

[¶ 12] As noted by the Supreme Court, "[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.... [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Interrogation in this sense encompasses not only direct questions, "but also ... any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. These elements are simply not present in this case.

[¶ 13] A review of the video establishes that Dominique's statements were not made in the context of actions by the police that were likely to elicit an incriminating response. Dominique was brought to the police station and left in the intoxilyzer room. When the officer returned, he removed Dominique's handcuffs and began to explain the procedure for the intoxilyzer. After the officer had finished his explanation, Dominique stated, without prompting, "It's not going to work, though," to which the officer replied, while putting away his handcuffs, "No?" Dominique then responded with potentially incriminating statements, and explained that he had relatives who were police officers. However, this exchange was not an interrogation: there is no evidence that Dominique either felt compelled or was induced to answer with substantive information by anything the officer said or did.

[¶ 14] At most, the officer's response—"No?"—may be viewed as a follow-up question for clarification purposes. "[T]hreshold or clarifying questions—neu-

tral questions posed by police in response to an ambiguous statement by a suspect—do not constitute interrogation." *State v. Simoneau*, 402 A.2d 870, 873 (Me.1979). Further, it cannot be inferred that the officer knew or should have known that this question was likely to elicit some kind of incriminating response.[2] *See id.* There are many reasons Dominique could have responded in this manner unrelated to the question of whether he was operating under the influence. For example, Dominique could have had a medical or other issue he wished to communicate to the officer that might have affected the accuracy of the intoxilyzer or his ability to complete the test; or there could have been technological reasons unrelated to Dominique's condition that he might have been referring to when he said, "It's not going to work."

[¶ 15] Dominique's interaction with the police officer was administrative in nature: the officer was speaking in the course of explaining the intoxilyzer and completing the booking process. Once Dominique explained why he believed the test would not work, the officer began typing on the computer. He continued the administrative process by asking Dominique for identifying information such as his mailing address, height, and weight; he then took Dominique's photograph, all while the intoxilyzer was warming up. The officer never asked Dominique any questions about whether he had been drinking, the stop, or any matters other than those related to the administration of the test and the booking process. As such, the officer's conduct did not generate the requirement of *Miranda* warnings because the ques-

tions he asked were administrative in nature and purpose. *See State v. Griffin*, 2003 ME 13, ¶ 9, 814 A.2d 1003, 1005. The officer's response, "No?", was not a departure from the routine processing naturally required for an officer about to administer an intoxilyzer test.

**B. The Sixth Amendment Right to Counsel**

[¶ 16] The development of the *Miranda* warnings stems from the Fifth Amendment[3] privilege against compelled self-incrimination. *See Innis*, 446 U.S. at 297, 100 S.Ct. 1682. In the absence of direct questioning of a suspect, a Fifth Amendment inquiry:

> focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.

*Id.* at 301, 100 S.Ct. 1682.

[¶ 17] However, in *Innis* the Supreme Court was careful to distinguish between the *Miranda* requirement and the Sixth Amendment right to counsel. The Sixth Amendment reads, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the [a]ssistance of [c]ounsel for his defence." U.S. Const. amend. VI. Where *Miranda* is concerned with the interrogation tactics and surroundings of the defendant, the Sixth Amendment inquiry is concerned with the role of law enforcement officers in obtain-

---

**2.** Though the officer testified at the hearing on the suppression motion, his testimony was limited to the factors surrounding the arrest, as he was not asked any questions related to the events that occurred after Dominique was brought into custody.

**3.** We note that the parties do not invoke the Maine Constitution. Accordingly, our analysis is limited to federal constitutional provisions.

ing information surreptitiously in an effort to avoid the necessity of having defense counsel present. The key inquiry is whether law enforcement officials have "deliberately elicit[ed]' incriminating information from a defendant in the absence of counsel," not whether the defendant felt compelled to give testimony. *Innis*, 446 U.S. at 300 n. 4, 100 S.Ct. 1682. For Sixth Amendment purposes it is not essential for the defendant to have been in custody and subject to interrogation for the constitutional protection to have attached. *Id.*

[¶ 18] The Superior Court found that the defendant's *"right to remain silent* was violated when his comments were recorded without his knowledge that they were being recorded, with or without an 'interrogator' (i.e. person) being present." (Emphasis added.) It then determined that "the 6th and 14th Amendment rights to counsel and the obligation to advise Mr. Dominique of his right to remain silent in the context of his statements being surreptitiously recorded, continued with or without the physical presence of an interrogator."

■ [¶ 19] As the court correctly noted, a defendant's Sixth Amendment right may be violated with or without interrogation. The key focus is on the involvement and intent of the law enforcement officer in soliciting the incriminating information. *See Fellers v. United States*, 540 U.S. 519, 524, 124 S.Ct. 1019, 157 L.Ed.2d 1016

(2004) ("We have consistently applied the deliberate-elicitation standard in ... Sixth Amendment cases."). For example, law enforcement officials violate a defendant's Sixth Amendment right when they take deliberate actions, after charges have been filed, and knowing a defendant is represented by counsel, to elicit incriminating information from the defendant by avoiding the formality of interrogation and obtaining information surreptitiously through a hidden wire attached to a seemingly innocent party. *See Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *State v. York*, 1997 ME 156, 705 A.2d 692.[4]

■ [¶ 20] In this case, the court emphasized that Dominique "made statements in the course of a cell phone conversation. Those statements were recorded audibly and visually on a recording system ... [when Dominique was not] advised that the recording system was operative." By itself, this scenario does not implicate the Sixth Amendment; the court did not also find that the police officer intended to entice or lull Dominique into making an incriminating statement for purposes of recording it when counsel was not present to advise him.

[¶ 21] In the present case, there was no indication that the officer had deliberately induced Dominique to make a phone call to his brother, under the guise of encouraging him to obtain bail money, with

---

**4.** In *Moulton*, the Court said that:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State.... [I]t is violated when the State obtains incriminating statements by *knowingly circumventing* the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Moulton*, 474 U.S. at 176, 106 S.Ct. 477 (emphasis added). In both *Moulton and in State*

*v. York*, the defendant had invoked the right to counsel and therefore police were not permitted to "interrogate" the defendant on the impending charges, either at the station or vicariously through a third party and a recording device, without his counsel present. The fact of the recording was important only in so much as it was part of the deliberate act of law enforcement to solicit and utilize the information it obtained via a third party while circumventing the need for an attorney.

the intent that Dominique would instead call someone else and make incriminating statements without the benefit of counsel. Moreover, after Dominique called his brother and bail had been arranged, it was Dominique who then chose to make an additional phone call, not contemplated by the police officer, during which he made additional incriminating statements. This was clearly unrelated to whatever "directive" Dominique claims may have been made by the officer.

[¶ 22] There is no basis from which to conclude that the police officer attempted to circumvent Dominique's Sixth Amendment right to counsel by inducing him to make incriminating statements to a third party and then secretly recording it.

[¶ 23] Because we conclude that there could not have been a violation of Dominique's Sixth Amendment right to counsel we do not address the threshold question, not raised by the motion, as to whether that right had attached at the point Dominique was in the intoxilyzer room. *See State v. Bavouset,* 2001 ME 141, ¶ 4, 784 A.2d 27, 29 ("The Sixth Amendment right to counsel does not attach until the defendant has reached a 'critical stage' in the proceedings." (citation omitted)).

C. The Fourth Amendment Protection Against Unreasonable Search and Seizures

[¶ 24] The Fourth Amendment guarantees that "[t]he right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. Thus, the Fourth Amendment "protect[s] us from unreasonable intrusions of police officers and other government agents." *State v. O'Rourke,* 2001 ME 163, ¶ 16, 792 A.2d 262, 266 (quotation marks omitted). Whether the Fourth Amendment has been violated "depends on whether the person invoking its

protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (quotation marks omitted). It is not necessarily related to representation by counsel, though clearly the two may intersect in some circumstances.

[¶ 25] In its appeal, the State also urges that we vacate the suppression order because, under the Fourth Amendment, there is " 'no reasonable expectation' of privacy for overheard or monitored conversations in . . . police interview rooms." Dominique did not raise the Fourth Amendment as a basis to support his motion to suppress the recorded statements. Consequently, the Superior Court did not address the State's contention in its ruling. Arguments which are not preserved for appeal are not properly before the Court. *See Berg v. Bragdon,* 1997 ME 129, ¶ 9, 695 A.2d 1212, 1214. Thus, we decline to reach the issue of the extent to which Dominique had an expectation of privacy in the police intoxilyzer room.

The entry is:

The suppression order is vacated; case remanded for further proceedings consistent with this opinion.