MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2013 ME 30
Docket:      Wal-11-479
Argued:      June 15, 2012
Decided:     March 14, 2013

Panel:       SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.
Majority:    LEVY, SILVER, MEAD, and JABAR, JJ.
Dissenting:  SAUFLEY, C.J., and ALEXANDER, and GORMAN, JJ.

STATE OF MAINE

v.

WILLIAM A. WILEY

LEVY, J.

[¶1]   William A. Wiley appeals from a judgment of conviction of seven counts of unlawful sexual contact (Class C), 17-A M.R.S. § 255-A(1)(E) (2012), and three counts of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(F) (2012), entered in the trial court (*A. Murray, J.*) following a jury trial.   Wiley argues that the court (*Hjelm, J.*) erred in denying his motion to suppress statements he made to a detective because (A) he was not advised of his *Miranda* rights prior to what he asserts was a custodial interrogation, and (B) his statements made prior to and after his arrest were involuntary.   Because we conclude that Wiley's statements were not voluntary, we vacate the judgment of conviction and remand for further proceedings.

## I. BACKGROUND

[¶2] The record on the motion to suppress establishes the following facts, which are presented in the light most favorable to the court's order. *See State v. Kent*, 2011 ME 42, ¶ 2, 15 A.3d 1286. On April 15, 2009, William Wiley's stepdaughter, then eighteen years old, reported to Detective Jason Bosco of the Waldo County Sheriff's Office that Wiley had sexual contact with her for a period of six months when she was approximately twelve years old.

[¶3] That day, Detective Bosco went to Wiley's residence at approximately 2:00 p.m. to discuss the victim's allegations with him. The detective was wearing plain clothes and his jacket covered his badge and weapon. He informed Wiley that he was conducting an investigation in which Wiley's name had come up, but did not disclose the subject matter of the investigation. Wiley agreed to ride with the detective in his unmarked cruiser to the sheriff's office to answer questions.

[¶4] Upon arrival, Detective Bosco took Wiley upstairs to an interview room. The interview room was approximately eight feet by ten feet, with one door, one window, a small table, and two chairs. Wiley sat between the detective and the door, with his back to the door. With Wiley's knowledge, Detective Bosco started the video and audio recording machines. Detective Bosco informed Wiley that he was not under arrest and was free to leave the interview room at any point. The door was closed, the detective explained, for their "privacy." The detective

did not advise Wiley of his *Miranda* rights at any point before or during the interview.

[¶5] Detective Bosco informed Wiley that his investigation was complete: he knew that Wiley had molested the victim. Wiley denied having had any sexual contact with the victim. Shortly after the interview began, Wiley, who was a public school teacher, became extremely emotional and began making statements such as "my life is over now" and "this is my life you're holding." Wiley sobbed at times and eventually slid to the floor of the room in a fetal position while the questioning continued. Approximately forty minutes into the interview, Wiley raised the prospect of being sent to jail, and the detective continued to urge Wiley to describe what he had done. Detective Bosco informed Wiley that he had two options: he could "own up" to his mistake and serve "a little bit of jail time" in county jail followed by probation, thus preserving his relationship with his son, or he could refuse to disclose the sexual contact with the victim and serve a sentence in state prison. The detective further urged Wiley to confess in order to prevent putting his family through a public proceeding.

[¶6] At one point, Wiley asked the detective, "Do I need a lawyer or anything?" Detective Bosco replied, "That's your choice, I can't make that decision for you." Wiley did not address the lawyer issue further or suggest that he

wanted to terminate the interview. He made a statement of concern for his family, and the interview continued.

[¶7] Nearly two hours into the interview, while exhibiting a calmer demeanor, Wiley described certain sexual contacts he had with the victim, but would not admit to penile penetration. Because Detective Bosco did not believe that Wiley was fully cooperating, he stated that he would terminate the interview. Wiley responded that he was trying to help the detective. The interview continued.

[¶8] Ultimately, Wiley admitted to all of the victim's allegations except penile penetration. At some points, Wiley admitted to or described certain acts with the victim. At other times, when asked about allegations made by the victim he responded with "whatever [she] says" or similar statements.

[¶9] Wiley was placed under arrest shortly after the conclusion of the interview. At the jail, Wiley asked Detective Bosco about a potential second victim, whom the detective had mentioned early in the interview. Detective Bosco read Wiley his *Miranda* rights, which Wiley affirmatively waived, orally. Wiley stated that he would admit to everything that he had previously admitted to, but would not admit to doing anything to the second potential victim.

[¶10] Wiley was charged in an eleven-count indictment including two counts of unlawful sexual contact (Class C), 17-A M.R.S. § 255-A(1)(E); eight counts of unlawful sexual contact with penetration (Class B), 17-A M.R.S.

§ 255-A(1)(F); and one count of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(B) (2012). Wiley pleaded not guilty to all the counts of the indictment.

[¶11] Wiley filed a motion to suppress the statements he made to the detective on April 15, 2009. Wiley asserted that his statements made prior to his arrest were in violation of his *Miranda* rights, and that those statements were involuntary. After a hearing, the court denied the motion to suppress. The court found that, based on the totality of the circumstances, the State had established by a preponderance of the evidence that Wiley was not in custody during the interrogation, and therefore *Miranda* warnings were not required. In addition, the court found that the State had proved beyond a reasonable doubt that the statements Wiley made both before and after his arrest were voluntary.

[¶12] Wiley's three-day jury trial began on April 25, 2011. During the trial, the victim described instances of Wiley touching her genitals with his hand, making her masturbate him, and digitally penetrating her vagina. When Wiley attempted to penetrate her vagina with his penis, approximately six months after the initial sexual contact, the victim told him to stop and threatened to tell her mother. After this incident, there was no further sexual contact between Wiley and the victim. The State offered the video and audio recordings of Wiley's interview with the detective, which the court admitted in evidence. The jury found Wiley guilty of seven counts of unlawful sexual contact without penetration (Class C),

17-A M.R.S. § 255-A(1)(E),[1] and three counts of unlawful sexual contact with penetration (Class B), 17-A M.R.S. § 255-A(1)(F).[2] The jury found Wiley not guilty of the one count of gross sexual assault. Wiley was sentenced to fifteen years at the Department of Corrections with all but three years suspended, and six years of probation.

## II. LEGAL ANALYSIS

[¶13] Wiley contends that the court erred in denying his motion to suppress because (A) he was subjected to custodial interrogation during his interview with

---

[1] Title 17-A M.R.S. § 255-A(1)(E) (2012) states:

**1.** A person is guilty of unlawful sexual contact if the actor intentionally subjects another person to any sexual contact and:

. . .

**E.** The other person, not the actor's spouse, is in fact less than 14 years of age and the actor is at least 3 years older. Violation of this paragraph is a Class C crime.

[2] Title 17-A M.R.S. § 255-A(1)(F) (2012) states:

**1.** A person is guilty of unlawful sexual contact if the actor intentionally subjects another person to any sexual contact and:

. . .

**F.** The other person, not the actor's spouse, is in fact less than 14 years of age and the actor is at least 3 years older and the sexual contact includes penetration. Violation of this paragraph is a Class B crime.

Detective Bosco, but had not been advised of his *Miranda* rights, and (B) his statements were involuntary.[3]

A.    Custodial Interrogation

[¶14]   Wiley argues that his statements from the interview, given without *Miranda* warnings, should be suppressed because he was the subject of a custodial interrogation.  "We review the denial of a motion to suppress for clear error as to factual findings and de novo as to issues of law."  *State v. Dodge*, 2011 ME 47, ¶ 10, 17 A.3d 128 (quotation marks omitted).  We discern no error in the court's factual findings, nor in its legal conclusion based on a preponderance of the evidence that Wiley was not in custody for purposes of the *Miranda* requirements.[4] *See id.*

B.    Voluntariness of Statements

[¶15]    A confession is admissible in evidence only if it was given voluntarily, and the State has the burden to prove voluntariness beyond a reasonable doubt.  *State v. McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d 335.  Wiley contends that his statements to the detective prior to and after arrest were

---

[3]   Wiley's additional assertion that his right to counsel was violated during his interview with Detective Bosco was not raised before the suppression court and is, therefore, not preserved. *See State v. Dominique*, 2008 ME 180, ¶ 25, 960 A.2d 1160.

[4] During the suppression proceedings, Wiley did not raise his contention that Detective Bosco elicited his post-arrest confession in violation of the *Miranda* requirements.  Accordingly, that argument is not preserved for our review on appeal.  *See id.*

8

involuntary because he made the statements while under severe emotional distress; the detective induced his statements by making offers of leniency; and the detective induced his statements with threats of what his family would have to endure if he did not admit to his sexual abuse of the victim. We review for clear error the court's determination of whether Wiley's confession was voluntary, because it is primarily a question of fact and the trial court "has observed the witnesses and weighed their credibility." *Id.* ¶ 11. The court's application of the law to the factual findings is reviewed de novo. *Id.*

[¶16] "The voluntariness requirement gives effect to three overlapping but conceptually distinct values: (1) it discourages objectionable police practices; (2) it protects the mental freedom of the individual; and (3) it preserves a quality of fundamental fairness in the criminal justice system." *State v. Sawyer*, 2001 ME 88, ¶ 8, 772 A.2d 1173 (quotation marks omitted). The standard for determining the voluntariness of a confession that we have applied for the past thirty years was first stated in *State v. Mikulewicz*: "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair."[5]

---

[5] We have indicated that the following "external and internal factors" may be considered to determine if a defendant's statements were voluntary:

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number

462 A.2d 497, 501 (Me. 1983); *see also State v. Nightingale*, 2012 ME 132, ¶ 33, 58 A.3d 1057 (stating that "a confession must be the free choice of a rational mind, fundamentally fair, and not a product of coercive police conduct" (quotation marks omitted)); *Dodge*, 2011 ME 47, ¶ 12, 17 A.3d 128 ("If a criminal defendant challenges the voluntariness of a confession, a court must determine if the confession resulted from the free choice of a rational mind, was not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." (quotation marks omitted)).

[¶17] Because a confession should not "result[] from threats, promises or inducements made to the defendant," *McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d 335 (quoting *Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173), courts are often called upon to evaluate whether a suggestion of leniency made during an interrogation constitutes an improper promise or inducement rendering the resulting confession involuntary. "A confession, otherwise freely and voluntarily made, is not vitiated by a[n improper] promise of leniency unless such promise was the motivating cause of the confession." *State v. Tardiff*, 374 A.2d 598, 601 (Me. 1977). In addition, "[a] confession motivated by a promise of leniency by a person with apparent [but not

---

of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. Dodge*, 2011 ME 47, ¶ 12, 17 A.3d 128 (quotation marks omitted).

10

actual] authority to execute the promise is involuntary." *State v. Lavoie*, 2010 ME 76, ¶ 21, 1 A.3d 408 (quoting *State v. Coombs*, 1998 ME 1, ¶ 11, 704 A.2d 387).[6] Accordingly, we turn to consider whether (1) the detective's conduct constituted an improper inducement to confess and, if so, (2) whether any such improper inducement was the motivating cause of Wiley's confession.

    1.    Whether the Detective's Statements Constituted Improper Inducements

[¶18] In its order denying Wiley's motion to suppress, the court found: "[Detective] Bosco . . . did not engage in any conduct or invoke any techniques that would render the defendant's statements involuntary. Thus, there was no state action undermining the defendant's free will." The question we must decide is whether the court committed clear error in its finding that Detective Bosco did not engage in any conduct or invoke any techniques that would render Wiley's statements involuntary. Almost all of the interview with Detective Bosco was videotaped and audiotaped, and there is no factual dispute as to the representations Detective Bosco made to Wiley prior to Wiley's confession.

[¶19] Approximately thirty-seven minutes into the interrogation, after Detective Bosco plainly stated his belief that Wiley had sexually abused the victim,

---

    6  In *Lavoie* we concluded that a confession was voluntary when a detective promised that the defendant would receive alcohol counseling if he confessed, but the detective did not promise leniency in the criminal case and the confession was not motivated by the suggestion of alcohol counseling. *See State v. Lavoie*, 2010 ME 76, ¶¶ 21, 24, 1 A.3d 408.

Wiley expressed his fear of jail. In response, the detective introduced the notion that if Wiley cooperated with the detective, Wiley would face only a short county jail sentence and probation:

> DETECTIVE: You've never been arrested for anything like this before, right?
> WILEY: I've never done anything.
> DETECTIVE: Okay, you've got no criminal history, nothing like this at all.
> WILEY: I haven't done anything.
> DETECTIVE: So . . . that leaves you a lot of options. . . . It doesn't mean you're gonna get sent to the big house and go to this big jail and have this awful label.
> WILEY: Sure it does.
> DETECTIVE: No it doesn't. Does it mean that you may have a little bit of jail time here in Waldo County? Yeah, it probably does. Does it mean that you may have a bunch of probation over your head? Yeah, probably. But it still means you have a life and you can still be a father to your son.

[¶20] Several minutes later, Detective Bosco told Wiley, in emphasizing the need for him to be truthful, that Wiley was in control of what would happen: "[Y]ou're writing your own future right now." The detective further stated that if Wiley was not truthful with him, Wiley would face much harsher consequences: "That gavel is gonna slam down a lot harder than what it's gonna be when you stand up and you are truthful through this whole thing. That from the very beginning, when you had that opportunity, today, on April 15th, that you took that opportunity and you were honest."

12

[¶21] Approximately one hour into the interrogation, Detective Bosco returned to the theme of jail versus prison, at which time Wiley crawled onto the floor of the interrogation room and assumed a fetal position:

WILEY: You're going to send me to jail.
DETECTIVE: Like I said, . . . those are things ahead of us right now. Like I said, there are consequences. But there's a big difference between a little bit of time in a county jail to a lot of time in a state prison. That's what we're talking about really. Remember talking about making your family at ease.
WILEY: What is, what is county jail?
DETECTIVE: County jail is right here. Right in this same building. The difference between a little bit of time to a real lot of time at a prison. And I don't think that's, . . . that's not going to be you.
WILEY: No matter what I say, I'm going to jail.
[Wiley crawls onto the floor.]
DETECTIVE: Yeah, I'm not going to lie to you, that's definitely, that's definitely something that's going to happen.

[¶22] Approximately ten minutes later, Wiley returned to his chair, and the interrogation again turned to the possibility of a county jail sentence and its connection to Wiley's relationship with his son:

DETECTIVE: You're writing your own punishment here. You are.

. . . .

DETECTIVE: Is your son in your future?
WILEY: It doesn't look like it.
DETECTIVE: It is. So you do a little bit of jail time here in the county. You have some probation, but your son is still part of your life. Right?

. . . .

DETECTIVE: You're writing your own future right now.  You can tell me about these things and I can write it up that way and I can write it up that you had this opportunity—I afforded you this opportunity and that you did the good, decent thing and you told me the truth about what happened.  You save [your stepdaughter] and you save your family.

[¶23]  Approximately eight minutes later, the detective explained:

DETECTIVE: *This offer's going to expire if . . . you're not going to do the right thing.*
WILEY: I'm trying to do the right thing. . . . What do you want me to do?  What do you want me to say?
DETECTIVE: I want you to tell me the truth about . . . you and [your stepdaughter].

(Emphasis added).

[¶24]  The interrogation continued on the topic of county jail, with the detective alternately saying that he could not "promise" such a sentence, but that he could "guarantee" that the judge would be more lenient and that people who "take this option . . . get maybe a little bit of jail time and some probation."

WILEY: So . . . what does my future look like?
DETECTIVE: It's in your hands.  I'm being a hundred percent honest with you. . . . I'm not going to lie to you, yes there's gonna be—
WILEY: I don't want you to lie to me.
DETECTIVE: There's gonna be some jail time.  Yep.  You can't . . . have these things happen and not have jail time. . . . [B]ut the difference between a little bit of jail time and a lot of jail time is you telling the truth and owning up to the things that you've done.  *I can tell you right now, I can't promise, I can't promise you anything because my job is just to, just to find the facts, put it in a package, and let the judicial system sort it out from there.*  But I can certainly tell you that if you're honest with me now, you're only, you're standing up for the things that you've done, and you're gonna stand in front of

14

that judge and you've got to own up for your mistakes. *And the judge is gonna be that much more lenient on you. I can guarantee you that.* People who sit up there and they deny it, deny it, deny it, go through long trials and get found guilty and they continue to deny it. That judge is going to hammer them on a sentence on that. . . .
WILEY: I don't want that to happen.
DETECTIVE: Okay. I'm just explaining to you the difference. . . . I've been doing this for quite some time now and I've seen some cases, I've seen some bad people take that route. Okay? *And I can tell you that the people that take this option now get a lot better deal. They get . . . maybe a little bit of jail time and some probation compared to a lot of jail time and no probation.* Okay? You've got to think of the big picture too here. You've got to think about are you going to be able to be . . . that guy for . . . your little [son]. Okay? Are you going to be able to be safe around him or do we need to be concerned that you are going to be hurting him in the future? I don't think that's the case. I don't think that, but that's going to be out of my control. You know, the Department of Human Services and people like that wind up getting involved. And they make those decisions. But if you're upfront and honest and admit to your mistakes and admit that you . . . did wrong some time ago by [your stepdaughter] and nobody else. Not . . . [your son] or not [your other stepdaughter] then those are things that can be worked with.

(Emphasis added.)

[¶25]  Detective Bosco's representation as to how certain it was that Wiley's cooperation would secure him a short jail sentence and probation was equivocal at times, with Detective Bosco stating at one point, "I can't *promise* you anything," but then, moments later stating that he could "guarantee" that the judge would be more lenient.  Nonetheless, it is inescapable that the overall effect of Detective Bosco's representations—which he alternately described as an "offer," "option," "opportunity," and chance to "write[] your own punishment"—was to establish

that if Wiley confessed to the crimes he would get a short county jail sentence with probation, and thereby avoid state prison. Wiley was told, "[t]he only reason you're getting this opportunity is because people spoke very highly of you," and that "[t]his offer's going to expire if . . . you're not going to do the right thing." The conclusion that this concrete representation was, in effect, an improper offer of leniency is inescapable.

> 2. Whether the Offer of a Short Jail Sentence and Some Probation Was the Motivating Cause of Wiley's Confession

[¶26] Because the court concluded that the detective did not employ any improper techniques, it did not address whether the offer of a short jail sentence and some probation was the motivating cause of Wiley's confession. The record reflects that Detective Bosco introduced the possibility of a short jail sentence with probation into the interrogation in response to Wiley's expressed fears of imprisonment, being labeled a sex offender, and losing his relationship with his family, in particular his relationship with his son. Wiley said, "As soon as I hit any kind of jail, with that label, I'm dead." Furthermore, Detective Bosco made repeated references to Wiley's son, telling Wiley: "If you want to have a life with your . . . family in the future, you need to stand up now and do the right thing . . . if you truly care about your son and care about your family, you're going to do the

16

right thing now . . . [i]f you lie about all these things, . . . it could come to the fact that you don't see your son for a while."

[¶27] Wiley's admission of wrongdoing did not begin until nearly two hours into the interrogation, after the lengthy back-and-forth between him and Detective Bosco regarding what would happen if Wiley cooperated or failed to cooperate. Just before Wiley began admitting to wrongdoing, Detective Bosco reiterated that the more favorable option presented to Wiley would terminate if Wiley failed to accept it then and there: "This is your option. Believe me. If you leave this room without taking my advice, the option's not going to be there anymore. You're going to have a much more difficult road to follow."

[¶28] Detective Bosco's representation regarding county jail versus prison, and the extended dialog he had with Wiley regarding it, were prominent aspects of the interrogation. His representation that Wiley's cooperation would control whether he ended up in jail or the state prison was far more specific and unconditional than were the various implied promises of leniency that we have sanctioned in prior decisions. *See State v. Nadeau*, 2010 ME 71, ¶ 57, 1 A.3d 445 (concluding that a police officer's statement to the defendant that "the more cooperative you are, the better things are for you" was not "an implicit threat or concrete promise of leniency"); *McCarthy*, 2003 ME 40, ¶¶ 7, 10, 13-14, 819 A.2d 335 (holding that a confession was voluntary where the defendant, who was

incarcerated in county jail and wanted to be transferred to the state prison, was told, "[y]ou know as well as I do that your chances of going to the prison are probably real good but I cannot promise you that"); *State v. Wood*, 662 A.2d 908, 910-11 (Me. 1995) (concluding that a confession was voluntary when detectives, after repeatedly disclaiming any authority over sentencing, assured the defendant that he was not in trouble for possessing a handgun used in a murder); *State v. Hutchinson*, 597 A.2d 1344, 1346 (Me. 1991) (concluding that even if a police officer made an implied promise of leniency by informing a defendant that telling the truth would "clear things up," the confession was voluntary because the defendant "clearly considered whether speaking would be in his best interest, but he was simply wrong in his conclusion").

[¶29]  Separate from the inducement presented by Detective Bosco, Wiley cites additional facts in support of his assertion that the State failed to carry its burden to prove voluntariness beyond a reasonable doubt.  These include that he was in extreme emotional distress during much of the interrogation, both crying and spending a portion of the interrogation on the floor in a fetal position; he had not been read his *Miranda* rights until after he was formally arrested; and he was isolated in a small, closed room in the sheriff's office.  Moreover, the detective told Wiley that the detective knew that he had committed the crimes; on seven separate occasions he expressed that he felt the need to have someone present to assist him,

once asking the detective whether he needed a lawyer; and he did not begin to confess until more than two hours into the interrogation. Whether considered individually or together, these additional facts did not compel the court to conclude that Wiley's confession was involuntary.

[¶30] Nonetheless, Detective Bosco's representation had to have caused Wiley to believe that not only would it be in his best interest to speak, but also that by speaking he would secure a specific sentencing outcome that was more favorable for him and his family. This powerful inducement to confess was repeated several times during the interrogation. The one-time-only opportunity to secure a short stay in the county jail, presented to Wiley who was, for the first time, confronted with serious criminal charges that could lead to a lengthy prison sentence, provided a powerful inducement to confess. We would need to disregard both experience and common sense to conclude that Detective Bosco's concrete representation of a short jail sentence followed by probation in exchange for Wiley's cooperation was not the primary motivating force for the ensuing confession.

3. Conclusion

[¶31] A confession is not voluntary where an interrogating officer, with no more than apparent authority, leads a suspect to believe that a confession will secure a favorable, concrete sentence, and that belief motivates the suspect to

confess. *See Lavoie*, 2010 ME 76, ¶ 21, 1 A.3d 408; *Mikulewicz*, 462 A.2d at 501. Considering the circumstances as a whole, and mindful that it is the State that bore the burden to prove voluntariness beyond a reasonable doubt, we conclude that the finding that Detective Bosco "did not engage in any conduct or invoke any techniques that would render the defendant's statements involuntary" was clear error. *See McCarthy*, 2003 ME 40, ¶ 11, 819 A.2d 335. Wiley's motion should have been granted.

The entry is:

> Judgment vacated. Remanded to the Superior Court for a new trial consistent with this opinion.

---

ALEXANDER, J., with whom SAUFLEY, C.J., and GORMAN, J., join, dissenting.

[¶32]  The Court has erred in two respects in vacating Wiley's conviction. First, rather than apply our standard of deferential appellate review, it has reached its conclusion as if it were the fact-finder in the first instance, and it has failed to acknowledge the trial court's superior vantage point in considering those facts. Second, in overriding the trial court's finding that Wiley's confession was voluntary, the Court has failed to focus on the critical aspect of the analysis—

Wiley's state of mind—and it has instead focused on the officer's statements.[7]

Accordingly, I must respectfully dissent.

## A. Precedent on Standard of Review

[¶33] In its opinion, the Court has missed the critical point of a voluntariness analysis by focusing on the actions of the officer rather than the effect of those actions on the defendant. There is no question that the burden rests with the State to prove voluntariness of confessions beyond a reasonable doubt. *See State v. Lavoie*, 2010 ME 76, ¶ 18, 1 A.3d 408; *State v. McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d 335; *State v. Coombs*, 1998 ME 1, ¶ 10, 704 A.2d 387. The trial court may find a defendant's statements voluntary if it finds that the statement is the result of the defendant's "own free will and rational intellect . . . as opposed to one that results from threats, promises or inducements made to the defendant." *McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d 335 (quoting *State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173); *see also State v. Rees*, 2000 ME 55, ¶ 8, 748 A.2d 976.

[¶34] We have regularly affirmed, as recently as three years ago, trial court findings that statements were voluntary, despite evidence of police statements

---

[7] Unlike the question presented in certain other suppression hearings, regarding the determination that the officer had a reasonable articulable suspicion of illegal or unsafe activity that is based on what a generic, reasonable officer would have understood, *State v. LaForge*, 2012 ME 65, ¶ 8, 43 A.3d 961, the decision regarding voluntariness requires an individualized assessment of the defendant's state of mind in the context of the officer's actions and conduct. Thus, a more deferential review of the trial court's analysis is called for.

during interviews that could be construed as promises of more lenient treatment or other inducements in return for confessions. *See Lavoie*, 2010 ME 76, ¶¶ 18-21, 1 A.3d 408 (affirming trial court findings that statements that officers could help defendant get treatment for his alcohol problem if he would "step up to the plate" and admit that he made a mistake did not render confession involuntary, although officers could not provide the promised treatment);[8] *State v. Nadeau*, 2010 ME 71, ¶ 57, 1 A.3d 445 (concluding that a police officer's statement to the defendant that "the more cooperative you are, the better things are for you" was not a threat or promise of leniency (alteration omitted)); *State v. Wood*, 662 A.2d 908, 911 (Me. 1995) (concluding that a confession was voluntary when detectives, after repeatedly disclaiming any authority over sentencing, assured the defendant that he was not in trouble for possessing a handgun used in a murder); *State v. Hutchinson*, 597 A.2d 1344, 1346 (Me. 1991) (concluding that even if a police officer's statement to a defendant that telling the truth would "clear things up" constituted an implied promise, the confession was voluntary because the defendant "clearly

---

[8] The Court's opinion suggests that *State v. Lavoie* supports vacating the trial court's findings here, asserting that *Lavoie* held that a confession motivated by a promise of leniency by a person with no more than apparent authority to execute the promise, or without actual authority to guarantee such a promise, is per se involuntary. The Court's reliance on *Lavoie* is misplaced. *Lavoie* affirmed a finding that a confession was voluntary, despite promises of assistance in receiving substance abuse treatment, by officers without authority to guarantee the promise, holding that, as here, the trial court properly focused on the defendant's state of mind motivating the confession, not the police promise that immediately preceded the confession. 2010 ME 76, ¶ 21, 1 A.3d 408. The *Lavoie* opinion also observed that a promise of leniency was not an issue in that case. *Id*.

considered whether speaking would be in his best interest, but he was simply wrong in his conclusion").

[¶35] We affirmed these voluntariness findings because our focus was on the defendant's state of mind, looking to evidence of exercise of the defendant's "own free will and rational intellect," rather than a focus on particular police statements. In most of the state and federal cases cited in this opinion, the promises or inducements at issue could not have been implemented by the officers making the statements because the officers lacked prosecutorial or other authority necessary to implement the promise or inducement. The officers' lack of authority did not render the confession following the promise or inducement per se involuntary, as in each instance the appellate court looked at the defendant's state of mind motivating the confession, not the content of the police statements inviting the confession. *See Lavoie*, 2010 ME 76, ¶ 21, 1 A.3d 408; *United States v. Villalpando*, 588 F.3d 1124, 1127-28 (7th Cir. 2009).

[¶36] The standard of review we have applied to trial court findings regarding promises and inducements has been consistent with that applied by other appellate courts. The United States Supreme Court has stated that, in evaluating confessions for voluntariness, no single fact should be determinative; instead a court should consider factors such as (1) police coercion, (2) length of interrogation, (3) location of interrogation, (4) continuity of interrogation, (5) the

suspect's maturity, (6) the suspect's education, (7) the suspect's physical condition and mental health, and (8) whether the suspect was advised of *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). As is clear from that list, the court's focus must be on the effect of the officer's alleged inducements on the defendant himself, not on how the officer's statements may be perceived by the reviewing court.

[¶37] Thus, we review the record to determine whether the motion court's assessment of the defendant's state of mind is supported by that record. Appellate review of trial court voluntariness findings is deferential and fact-based, pursuant to the clear error standard of review. *Lavoie*, 2010 ME 76, ¶¶ 13, 18-22, 1 A.3d 408. In *United States v. Hughes*, the First Circuit articulated the standard of review as follows:

> Under clear error review, we may reverse only if the record, read as a whole, gives rise to a strong, unyielding belief that a mistake has been made. This deferential standard of review portends that when the district court chooses to draw a reasonable (though not inevitable) inference from a particular combination of facts, that inference is entitled to respect. Thus, [i]f any reasonable view of the evidence supports the denial of a motion to suppress, we will affirm the denial.

640 F.3d 428, 434 (1st Cir. 2011) (citations and quotation marks omitted).

[¶38] The First Circuit also emphasized that the record must be reviewed considering the "totality of the circumstances." *Id*. at 438.

24

[¶39] Rejecting an argument that it should review voluntariness findings de novo because it, like the district court, had a complete transcript of the interview in which the allegedly false promises were made, the Seventh Circuit in *Villalpando*, observed: "Whether a statement is voluntary is a matter of law. We judge, however, the voluntariness of a confession under the totality of the circumstances, which of course means that we consider whether the underlying facts as found by the trial court support the conclusion that the confession was voluntary." 588 F.3d at 1127 (citations omitted).[9]

[¶40] The Seventh Circuit then proceeded to describe its deferential standard of review on promises and inducements issues as follows:

> while a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible. 'Trickery, deceit, even impersonation do not render a confession inadmissible . . . unless government agents make threats or promises.' . . . So, for [the defendant] to succeed here, he has to establish that his interrogator made him a promise that was materially false and thus sufficient to overbear his free will. . . . The reason we treat a false promise differently than other somewhat deceptive police tactics (such as cajoling and duplicity) is that a false promise has the unique potential to make a decision to speak irrational and the resulting confession unreliable.

---

[9] To support this proposition the Seventh Circuit cited the United States Supreme Court's observation in *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574-75 (1985), that, "The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources."

*Id*. at 1128 (citations omitted) (referencing *United States v. Montgomery,* 555 F.3d 623, 630 (7th Cir. 2009) (collecting cases and noting that not every false promise constitutes coercion)).

[¶41] Addressing its criteria for review of voluntariness issues, the Sixth Circuit, in *United States v. Stokes*, articulated "three requirements for finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." 631 F.3d 802, 808 (6th Cir. 2011); *see also United States v. Delaney*, 443 Fed. App'x 122, 128 (6th Cir. 2011) (same). The Fifth Circuit has held that "the defendant must establish a causal link between the coercive conduct and the confession." *United States v. Turner*, 674 F.3d 420, 433 (5th Cir. 2012).

[¶42] Applying its review criteria to identify those promises and inducements that can be coercive, the Sixth Circuit has held that:

> in certain circumstances, [p]olice promises of leniency and threats of prosecution can be objectively coercive. Generally, however, promises of leniency are coercive only if they are broken or illusory, and promises to recommend leniency or speculation that cooperation will have a positive effect do not make subsequent statements involuntary.

*United States v. Montgomery*, 491 Fed. App'x 683, 687 (6th Cir. 2012) (citations and quotation marks omitted).

[¶43]   These precedents establish that the following principles guide our appellate review of trial court findings that a confession was voluntary when promises or inducements are at issue:

1.   The record will be reviewed deferentially and most favorably to the trial court's findings.

2.    When the trial court draws a reasonable (though not inevitable) inference from a particular combination of facts, that inference is entitled to deference.

3.   The inquiry looks at the totality of the circumstances leading to the confession, with a focus on the defendant's state of mind in making the statements, not on any particular statements made by investigators.

4.   Promises of leniency in return for cooperation and confession, and even some deception and cajoling, may be part of acceptable investigatory techniques, but false, illusory, or broken promises of leniency constitute improper coercion that may render a confession involuntary and subject to suppression.

5.    If there is improper coercion in an investigation leading to a confession, that improper coercion must be a critical motivating factor or cause for the confession to render the confession involuntary and subject to exclusion.

B.   Application of Established Standards of Review to Facts of this Appeal

[¶44]   Applying these standards to the facts here is illustrative.   William Wiley was a long-time elementary school music teacher.   In that profession, Wiley was certainly well aware of the severe consequences that befall teachers and other

adults who sexually abuse young children. Despite this knowledge, during the first half of 2004, Wiley repeatedly sexually abused his then-twelve-year-old stepdaughter. The abuse included numerous incidents of Wiley digitally penetrating the girl's genitals and forcing her to touch his genitals.

[¶45] After the abuse ended, Wiley, the victim, Wiley's wife, and his young son continued to live together for nearly five years. Wiley continued in his employment as a music teacher. He may have assumed that his sexual misconduct with his stepdaughter was behind him and in the past.

[¶46] In April 2009, Wiley's stepdaughter, then eighteen years old, reported Wiley's sexual abuse to a detective of the Waldo County Sheriff's Department. After interviewing the victim, the detective went to Wiley's residence in the early afternoon to discuss the victim's allegations with him. The detective did not disclose the subject matter of the investigation. Rather than discuss the matter at home, Wiley elected to ride with the detective in his unmarked cruiser to the sheriff's department to answer questions.

[¶47] Upon arrival at the sheriff's department, the detective took Wiley upstairs to an interview room as discussed in the Court's opinion. The detective then informed Wiley that he knew that Wiley had sexually abused his stepdaughter. Wiley initially denied any sexual impropriety with the victim. The video of the interview indicates that Wiley then started crying and breathing

heavily. He began making statements such as "I see my life being over now," "this is my life you're holding," and "my life is over now."

[¶48] The detective responded to one of Wiley's "life is over now" statements by saying "it's not over, but it's gonna be, you're gonna have a difficult road ahead of you, yes, but you still have a son that loves you and you've still got a family that loves you. And you have their support." The detective then indicated that Wiley could lose his family's support "if you sit here and adamantly deny the things that we know you did." The detective repeatedly stated to Wiley that "[he] need[ed] to do the right thing" for his family by "standing up" and admitting that he had sexual contact with the victim.

[¶49] Approximately forty minutes into the interview, Wiley raised the prospect of his going to jail for his actions: "[i]n your eyes, either way . . . I'm going to jail or something." The detective continued to urge Wiley to describe what he had done. Wiley, whom the trial court could have inferred feared severe consequences for acts that he thought were in the past but had now come back to haunt him, responded "as soon as I hit any kind of jail, with that label, I'm dead." The detective then told Wiley that, as he had no prior criminal record, admitting he had sexual contact with the victim "doesn't mean you're gonna get sent to the big house and go to this big jail and have this awful label . . . . Does it mean that you may have a little bit of jail time here in Waldo County? Yeah, probably it does.

Does it mean that you may have a bunch of probation over your head? Yeah, probably. But it still means that you've got a life and you can still be a father to your son."

[¶50] The detective informed Wiley that he had two options: he could "own up" to his mistake and serve his sentence in county jail, or he could refuse to disclose the sexual contact with the victim and serve his sentence in state prison. The detective explained, "That gavel is gonna slam down a lot harder than what it's gonna be when you stand up and you are truthful through this whole thing." The detective further urged Wiley to confess in order to avoid putting his family through a public proceeding.

[¶51] The detective cautioned Wiley that the detective was not making any promises and that the court, not the detective, would ultimately decide any sentence: "I can tell you right now, I can't promise, I can't promise you anything because my job is just to, just to find the facts and let the judicial system sort it out from there."

[¶52] Later in the interview, Wiley began to describe certain sexual contacts he had with the victim. At some points, Wiley admitted to or described certain acts with the victim. At other times, when asked about allegations made by the victim he responded with "whatever she says" or similar statements.

[¶53] As indicated in the Court's opinion, the suppression court denied the motion to suppress. On the voluntariness issue, the court found that the State had proved beyond a reasonable doubt that Wiley's statements were voluntary. In reaching that decision, the court noted, among other things, that Wiley was "very careful about the extent of any admissions he was willing to provide," and that this "demonstrate[d] that [Wiley] was able to control his cognitive process and was able to make statements that he wanted to make."

C.    Analysis of Contested Issues

[¶54] To invalidate what the trial court has found to be a voluntary confession, our standard of review requires that the record on appeal must establish, without the capacity for the trial court to conclude otherwise, that a promise of leniency or other police coercion was the "motivating cause of the confession." *State v. Bragg*, 604 A.2d 439, 440 (Me. 1992); *State v. Durost*, 497 A.2d 134, 137-38 (Me. 1985); *Turner*, 674 F.3d at 432-33 (defendant must establish a causal link between coercion and confession); *Delaney*, 443 Fed. App'x at 128 (coercion must be the "crucial motivating factor" leading to confession).

[¶55] A causal link between coercion and confession has been occasionally found. *See Lynumn v. Illinois*, 372 U.S. 528, 532-34 (1963) (finding that the defendant's involuntary confession was motivated by the officers' illusory promise that she would not lose custody of her children and welfare payments if she

cooperated); *State v. Tardiff*, 374 A.2d 598, 601 (Me. 1977) (finding that the defendant's involuntary confession was motivated by the officer's false promise to drop charges in exchange for his cooperation). But these findings of coercion were premised on false or illusory promises as addressed in the more recent precedent discussed above.

[¶56]  Here, the record reflects that discussion regarding the possible jail sentence and violence in prison was initiated by Wiley. After Wiley expressed concern that "as soon as I hit any kind of jail, with that label, I'm dead," the officer responded with the observations at issue on this appeal. Specifically, the officer stated that Wiley would not necessarily go to "the big house" and that, although Wiley would certainly serve some jail time and a long period of probation, he might avoid a long prison sentence if he admitted his acts and did not put the victim and his family through the ordeal of a trial.

[¶57]  The officer's statements regarding likely sentencing options were consistent with the law addressing sentencing of sexual abusers of children, as we articulated it in *State v. Farnham*, 479 A.2d 887, 889-893 (Me. 1984) (approving the trial court's rejecting as mitigating factors defendant's claims of reform, rehabilitation, remorse and concern for the victim and imposing a seven-year sentence when defendant had taken the case to trial, engaged in aggressive and demeaning cross-examination of the victim, and admitted his abuse of the victim

and claimed to have reformed only after he had been found guilty). The officer's statements were also reflective of the law applied in the federal courts where acceptance of responsibility for an offense and avoidance of trial can result in a two-level decrease in the offense level for any particular crime. *U.S. Sentencing Guidelines Manual* § 3E1.1(a) (2012). Such a reduction is generally not available when a defendant denies guilt and puts the prosecution to its proof at trial. *Id*. § 3E1.1(a) cmt. 2.

[¶58] Certainly the trial court could, and apparently did, infer that while the detective may have suggested or promised leniency in return for a confession, the promise of leniency was not false, illusory, or broken, the factors referenced in the case law that can render a suggestion or promise of leniency improper coercion. Accurately advising Wiley of choices he could make that could affect sentencing options did not, as a matter of law, constitute a prohibited promise of leniency. This record does not compel a conclusion that there was any coercive, improper promise of leniency that was the "crucial motivating factor" or causal link leading to Wiley's confession.

[¶59] The suppression hearing record supports the trial court's finding that the detective "did not engage in any conduct or invoke any techniques that would render the defendant's statements involuntary. Thus, there was no state action undermining the defendant's free will." This statement would be a factual error

only if one interprets this trial court finding, as the Court apparently does, to state that the detective did not make any promises or inducements or apply any techniques to secure Wiley's confession. However, a fair interpretation of the trial court's statement is that, although there were suggestions, even promises, of leniency if Wiley cooperated, those suggestions did not go beyond the bounds established by precedent for such investigatory questioning and, accordingly, were not improper conduct or techniques "that would render [Wiley's] statements involuntary."

[¶60] If the focus is on Wiley's state of mind when he made his statements, and not on the words the officer used in discussion with Wiley, there is sufficient evidence in the record to support the trial court's findings that: (1) the detective "did not engage in any conduct or invoke any techniques that would render the defendant's statements involuntary," (2) "there was no state action undermining the defendant's free will," and (3) the State proved beyond a reasonable doubt that Wiley's incriminating statements to the detective were voluntary.

[¶61] Applying the standard of review applied to these questions in the past, and respecting precedent indicating that promises of leniency may become improper coercion as a matter of law only when the promises are false, illusory, or broken, I would affirm the motion court's findings and the trial court's judgment.

34

**On the briefs and at oral argument:**

Steven C. Peterson, Esq., West Rockport, for appellant William A. Wiley

Eric J. Walker, Dep. Dist. Atty., Belfast, for appellee State of Maine

Waldo County Superior Court docket number CR-2009-112
FOR CLERK REFERENCE ONLY