MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:    2017 ME 123
Docket:      Ken-16-455
Argued:      May 9, 2017
Decided:     June 20, 2017

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

ANDREW L. SEAMON

MEAD, J.

[¶1]  Andrew L. Seamon appeals from a judgment of conviction of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1) (2016), entered by the trial court (Kennebec County, *Murphy, J.*) following a jury trial.  Seamon contends that the court erred by denying a motion to suppress statements he made during an interview with a detective because his statements were not made voluntarily.  He also appeals his sentence, arguing that the court erred by considering conduct of which he had been acquitted and unreliable evidence in setting his basic sentence.  Finally, Seamon contends that the court erred by instructing him to register as a Tier III registrant pursuant to the Sex Offender Registration and Notification Act of 2013 (SORNA 2013) instead of as a lifetime registrant pursuant to the Sex Offender Registration and Notification Act of

2

1999 (SORNA 1999). We affirm both the judgment and the sentence, but we clarify that Seamon will be required to register pursuant to SORNA 1999 upon his release from incarceration.

## I. BACKGROUND

[¶2] Viewed in the light most favorable to the court's order, the record on the motion to suppress supports the following facts. *See State v. Wiley*, 2013 ME 30, ¶ 2, 61 A.3d 750.

[¶3] On June 5, 2014, Detective Tori Tracy of the Augusta Police Department went to interview Andrew Seamon at his friend's home in Augusta. She had been investigating allegations of sexual abuse by Seamon against a child. Tracy drove an unmarked police cruiser and wore plain clothes. Her badge and handgun were covered by clothing and were not immediately apparent. She carried a concealed tape recorder to secretly record her conversation with Seamon.

[¶4] When Detective Tracy first approached Seamon, he did not know why she was there. He initially believed it might be related to a pending foreclosure on his home. Seamon agreed to speak with Detective Tracy; she let him choose where he wanted to talk, and he selected a spot outside his friend's home. She told him that she was only there to talk to him and that she would

be leaving alone that day, implying that she would not arrest him. Tracy did not inform Seamon that the interview was being recorded and did not give Seamon *Miranda* warnings.

[¶5] Detective Tracy explained that she was there regarding Seamon's involvement with a child, and Seamon understood what she was referring to. Seamon told Tracy that he was nervous and "not in good shape at all," but that he would cooperate with her. He denied engaging in any sexually inappropriate conduct with any children. Tracy encouraged Seamon to tell her the truth about what had happened. Seamon never admitted to engaging in a sexual act with the child, but described several instances of potentially inappropriate things he may have done or said to the child. After about forty-five minutes, Detective Tracy attempted to end the conversation, but Seamon asked her if she could stay to talk to him longer. Seamon asked her if he was going to be arrested; she explained the court process and said that Seamon might be arrested at some point in the future if the case went forward. The entire interview lasted about one hour, after which Detective Tracy left alone in her police cruiser.

[¶6] On June 27, 2014, Andrew Seamon was indicted on two counts of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2016). In November, a

4

superseding indictment was returned that added one count of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1).

[¶7] On February 19, 2016, Seamon filed a motion to suppress the statements he made to Detective Tracy, alleging that the statements were made involuntarily and in violation of *Miranda*. A hearing on the motion was held on May 23, 2016. At the hearing, Seamon described how, at the time of the interview, he was "bewildered," suicidal, and felt that his "life was upside down." He had been feeling "extremely depressed" and had, in the months prior to the interview, been in the psychiatric unit of a hospital. He testified that he had submitted to Detective Tracy's authority and that he had not answered her questions of his own free choice because he was not thinking rationally at that time. The entire recording of his conversation with Detective Tracy was admitted in evidence at the motion hearing.

[¶8] In an order dated June 16, the court (*E. Walker, J.*) denied the motion. The court determined that Seamon was not in custody for *Miranda* purposes, and it determined that his statements were made voluntarily. The court found that the interview occurred in a place of Seamon's choosing, which was a location he was comfortable in; Seamon was told several times that he was not going to be arrested that day; only one plain-clothed officer was present and

she did not display her gun; Seamon and the officer were familiar with one another and "on friendly terms"; the questioning was "gentle and not harsh or accusatory"; and Seamon's "demeanor seemed calm and in control." The court found "no evidence of any coercion or threats or trickery made by police," and determined that Seamon "was not made any promises or offered any deals" when he made the statements. The court concluded that the State had proved beyond a reasonable doubt that Seamon's statements "were clearly the choice of a rational and clear thinking mind," and under all of the circumstances, the "admission of [his] statements would be fundamentally fair."

[¶9] The court (*Murphy, J.*) held a jury trial on August 30–September 1, 2016. At the trial, the child testified and described several discrete instances of Seamon having sexual contact with him: first, Seamon "messed around with" and "jiggl[ed]" the child's genitals; another time, Seamon lubricated the child's genitals and made the child penetrate Seamon's anus; on another occasion, Seamon performed oral sex on the child; and, after the child had disclosed the previous incidents to other children, Seamon "did the same thing he did the first time . . . messed around with [the child's] penis." A redacted version of the recording of Seamon's interview with Detective Tracy was played for the jury.

6

[¶10]  The jury was unable to reach a verdict on the count of gross sexual assault pertaining to the alleged anal-genital contact[1] and found Seamon not guilty on the count of gross sexual assault alleging oral-genital contact. The jury found Seamon guilty on the count charging unlawful sexual contact.

[¶11]  The parties filed sentencing memoranda on September 19, 2016, and the court held a sentencing hearing on September 21, 2016. At the sentencing hearing, Seamon argued that information related to the gross sexual assault charges was "not reliable" and should not factor into sentencing. The court responded, "Just to be clear . . . I don't intend to consider any of the allegations of gross sexual assault in the sentencing analysis. I don't think that I can do that based upon the verdicts, so—but I think—what I know I have to do is address the conviction for unlawful sexual contact, Class B."

[¶12]  In setting Seamon's basic sentence,[2] the court explained:

[T]he [c]ourt would consider that we're talking about more than one incident as described by the victim. And the [c]ourt would find

---

[1] The court declared a mistrial on this count, and the charge has since been dismissed.

[2] "In the sentencing process, the trial court must first determine a basic period of incarceration. That determination is made *solely* by reference to the offender's *criminal conduct* in committing the crime, that is, by considering the particular nature and seriousness of the offense without regard to the circumstances of the offender." *State v. Hewey*, 622 A.2d 1151, 1154 (Me. 1993) (quotation marks omitted); *see* 17-A M.R.S. § 1252-C(1) (2016). After that, the court is required to individualize the sentence by considering aggravating and mitigating factors to determine the maximum period of incarceration. *See* 17-A M.R.S. § 1252-C(2) (2016); *Hewey*, 622 A.2d at 1154. The third and final step for the court is to determine if a portion of the sentence should be suspended, and if so, determine the appropriate period of probation. *See* 17-A M.R.S. § 1252-C(3) (2016); *Hewey*, 622 A.2d at 1155.

based on what evidence it believes is factually reliable and relevant, and those are—that's the terminology from the *Hewey* and other cases, that there were three [discrete incidents] testified to by [the child].

The first one is described at the very beginning of his testimony where he talks about [the defendant] wiggling his genitalia. There is a second incident where he describes on a different—definitely on a different day or a different time frame the defendant lubricating the genitalia of [the child]. And then there is a third incident where he states that after about a month or so there was another incident where he says he did it again. The state asks what he meant by that, and he said—he referred to again the defendant touching his penis.

The court set the basic sentence in the "mid-range" of the zero-to-ten-year continuum for a Class B conviction, *see* 17-A M.R.S. § 1252(2)(B) (2016), for a basic sentence of five to six years.

[¶13] Moving on to the second step of the sentencing process, the court discussed aggravating factors—that the child was eight years old at the time and may have a developmental disability, that Seamon told the child he would kill himself if the child told anyone, and that Seamon had told the child he was engaging in a religious sin—and mitigating factors—namely that Seamon had accepted some responsibility for his actions and apologized to the victim's family—and set Seamon's maximum sentence at nine years. The court found that Seamon would benefit from counseling and that he expressed an interest in the rehabilitative process. It considered the deterrent effect of the sentence

8

it might impose, as well as the gravity of the offense, and arrived at a final sentence of nine years' incarceration, with all but six years suspended, followed by twelve years of probation. A condition of Seamon's probation is that he have no direct or indirect contact with the child.

[¶14] Near the end of the sentencing hearing, the court explained that "Mr. Seamon will have to register under the Maine Sex Offender Registry and Notification Act as a [T]ier III offender, which is a lifetime registration requirement. . . . And I also have a form that we have to give you, Mr. Seamon, that notifies you about your obligation to register under the Maine SORNA laws." Seamon received a form explaining his duty to register pursuant to SORNA 2013, which Seamon signed that day.

[¶15] On November 30, 2016, the Sentence Review Panel granted Seamon leave to appeal his sentence. *See State v. Seamon*, No. SRP-16-505 (Me. Sent. Rev. Panel Nov. 30, 2016). Seamon's appeal from his sentence was consolidated with the appeal of his conviction. *See* M.R. App. P. 20(h).

## II. DISCUSSION

A.    Motion to Suppress

[¶16] Seamon argues that the motion court erred in denying his motion to suppress because his statements to the detective were made involuntarily.

He asserts that we should consider, among other things, what he characterizes as the "excessively friendly" nature of the interview with Detective Tracy and his mental health issues.

[¶17]  "The determination of whether a statement is voluntary is a mixed question of fact and law, such that the court's factual findings are reviewed for clear error and its application of legal principles to those findings is reviewed de novo." *State v. Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595.  "[W]hen a defendant in a criminal case moves to suppress statements on the ground that they were made involuntarily, the State has the burden to prove voluntariness beyond a reasonable doubt."  *State v. Hunt*, 2016 ME 172, ¶ 17, 151 A.3d 911.  We recognize "a distinction between those statements that must be excluded pursuant to the Fifth Amendment because they are the product of compulsion, and those statements that must be excluded because their admission would otherwise create an injustice."  *Id.* ¶ 19.  Because Seamon asserts that the admission of his statements violates due process, we will "examine whether his statements were free and voluntary or whether, considering the totality of the circumstances under which the statements were made, their admission would be fundamentally unfair."  *Id.*

[¶18] The voluntariness requirement encompasses "three overlapping but conceptually distinct values: (1) it discourages objectionable police practices; (2) it protects the mental freedom of the individual; and (3) it preserves a quality of fundamental fairness in the criminal justice system." *Wiley*, 2013 ME 30, ¶ 16, 61 A.3d 750 (quotation marks omitted). "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." *State v. Mikulewicz*, 462 A.2d 497, 501 (Me. 1983). We determine whether a confession was voluntary by examining the "totality of the circumstances," considering such relevant circumstances as

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*Hunt*, 2016 ME 172, ¶ 22, 151 A.3d 911 (emphasis and quotation marks omitted). We have held that "generalized and vague statements" suggesting that a defendant should cooperate because it would be helpful in the long run "do not constitute impermissible offers of leniency," *State v. Kittredge*, 2014 ME 90, ¶ 28, 97 A.3d 106; likewise, "[m]ere admonitions or exhortations

to tell the truth will not, by themselves, render a confession involuntary," *State v. Tardiff*, 374 A.2d 598, 601 (Me. 1977).

[¶19] Here, the totality of the circumstances of Seamon's interview with Detective Tracy support the conclusion that his statements were voluntary. Detective Tracy was the only officer present at the interview, and she was dressed in plain clothes and her weapon was not readily apparent, *see State v. Lavoie*, 2010 ME 76, ¶ 19, 1 A.3d 408; the interview took place outside of Seamon's friend's home, at a location of Seamon's choosing, *see Bryant*, 2014 ME 94, ¶ 17, 97 A.3d 595; Detective Tracy asked Seamon if he would speak with her and he agreed to do so, *see id.*; the interview lasted about an hour and would have ended earlier absent Seamon's request that Detective Tracy stay longer, *see State v. Coombs*, 1998 ME 1, ¶¶ 6, 12, 704 A.2d 387; and Detective Tracy did not threaten or trick Seamon, *see State v. McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d 335.

[¶20] Moreover, although Seamon now objects to Detective Tracy's friendly demeanor and her encouragement for Seamon to tell the truth, the motion court's factual finding that Detective Tracy did not make any suggestions or promises of leniency to secure his statements was fully supported by the record and was not clearly erroneous. We contrast this case

with *State v. Wiley*, where we concluded that a detective made an improper offer of leniency when he specifically represented that the defendant's cooperation would result in a shorter county jail sentence with probation instead of time in state prison. 2013 ME 30, ¶¶ 18-25, 61 A.3d 750. We held that "[a] confession is not voluntary where an interrogating officer, with no more than apparent authority, leads a suspect to believe that a confession will secure a favorable, concrete sentence, and that belief motivates the suspect to confess." *Id.* ¶ 31. Here, Detective Tracy made no statements, representations, or promises that Seamon's cooperation would result in an explicitly more favorable sentence if the case were prosecuted, and her encouragement to Seamon to tell the truth was not, without more, sufficient to render his statements involuntary. *See Hunt*, 2016 ME 172, ¶ 23, 151 A.3d 911. We find unpersuasive Seamon's argument that his statements were involuntary because of the friendly nature of the interview.

[¶21] Furthermore, we conclude that Seamon's mental state at the time of the interview did not render his statements involuntary. During the interview, Seamon told Detective Tracy that he had just completed an intensive outpatient program, was "not doing well at all," was nervous, and had anxiety issues. At the hearing, Seamon testified that he had been admitted to a

psychiatric hospital unit a few months prior to the interview, and that he felt "bewildered" and "depressed" when speaking to Detective Tracy. He testified that he was a people-pleaser and submitted to Detective Tracy's authority. The court did not find Seamon credible on these points and noted that there was no psychological evidence presented regarding his condition. The court also found that Seamon did not appear to be sick or ill at the time of the interview, did not appear to be suffering from any obvious mental health problems, and always gave answers that made sense and were coherent. We discern no clear error in the court's findings and, in applying legal principles to those findings, conclude that, in the totality of the circumstances, Seamon's statements were voluntary. *See Bryant*, 2014 ME 94, ¶ 18, 97 A.3d 595 (concluding that despite evidence that the defendant appeared "visibly shaken" and "in shock" during a police interview, there was no evidence that his "distress rose to the level of mental or emotional instability required to render his statements involuntary"); *State v. Larson*, 577 A.2d 767, 769-70 (Me. 1990) (holding that a defendant's statements were, considering the totality of the circumstances, made voluntarily even when the defendant had "introduced expert psychological testimony to the effect that he had an overwhelming need to please people" and

14

argued that he was only telling the officer what he thought the officer wanted to hear).

[¶22] Accordingly, we conclude that the suppression court did not err when it denied Seamon's motion to suppress the statements he made during the interview with Detective Tracy.

B.    Sentencing

[¶23] Seamon contends that the court erred by considering three instances of Seamon's sexual contact with the child when it set his basic sentence.[3] When we have granted a request to appeal a sentence, we are "statutorily mandated to review any part of the sentence, including the basic term, for an abuse of the court's sentencing power," *State v. Reese*, 2010 ME 30, ¶¶ 21, 23, 991 A.2d 806, and will review the court's determination of a basic sentence de novo for misapplication of sentencing principles, *State v. Stanislaw*, 2013 ME 43, ¶ 17, 65 A.3d 1242.

[¶24] We have held that courts "have broad discretion in determining what information to consider in sentencing; they are limited only by the due

_____

[3] Seamon also asserts that the court erred by not considering as a mitigating factor his history of being sexually abused. "We review the sentencing court's consideration of aggravating and mitigating factors for an abuse of discretion." *State v. Schofield*, 2006 ME 101, ¶ 13, 904 A.2d 409. "Such abuse may occur when a material factor deserving significant weight is ignored." *Id.* (quotation marks omitted).

process requirement that such information must be factually reliable and relevant." *State v. Witmer*, 2011 ME 7, ¶ 20, 10 A.3d 728 (quotation marks omitted); *see also Reese*, 2010 ME 30, ¶ 28, 991 A.2d 806 ("The court has wide discretion in determining the sources and types of information to consider when imposing a sentence."). Facts regarding uncharged criminal conduct may be considered during sentencing "in order to obtain a complete and accurate picture of the person to be sentenced." *State v. Dumont*, 507 A.2d 164, 166 (Me. 1986). Information derived from the trial process "is factually reliable because it is derived from sworn testimony of witnesses subject to cross-examination and observation by the court." *Id.* at 166-67. In this case, the child testified at the trial and was subject to cross-examination, and the court was able to observe the child as a witness; therefore, the court was entitled to find that the child's testimony was factually reliable. *See id.*

---

Seamon's own sexual victimization cannot be presumptively deemed a mitigating factor. "Mitigating factors include, among other things, a lack of prior criminal conduct, remorse, and any other factor that points to the defendant's favorable prospect of rehabilitation or a lesser likelihood of reoffense." *Id.* ¶ 14 (quotation marks omitted). As a victim of sexual abuse, Seamon would presumably have been aware of its profoundly harmful effect on a child, but he nevertheless elected to repeatedly subject a child to the same cruel actions.

Furthermore, even if Seamon's sexual victimization could be considered a mitigating factor, the court did not commit reversible error by failing to expressly reference that factor when sentencing Seamon. *See* 17-A M.R.S. § 1252-C(2); *Hewey*, 622 A.2d at 1154-55. The court stated that it had reviewed the parties' sentencing memoranda, which discussed Seamon's history of being sexually abused as a child.

[¶25]  The second instance of sexual contact, involving lubrication, had allegedly occurred immediately prior to conduct underlying the first count of gross sexual assault, and, for sentencing purposes, the court was entitled to consider that limited aspect of the testimony.  Although the jury could not reach a verdict on that count, the child's testimony regarding the related sexual contact is not necessarily unreliable; the jury could have believed that Seamon engaged in sexual contact with him without committing the act that would have constituted gross sexual assault.  As to the third instance of contact that the court considered, we conclude that the record is clear that the court was referring to an incident of sexual touching by Seamon and not to, as Seamon asserts, oral-genital contact underlying the second count of gross sexual assault of which Seamon was acquitted.

[¶26]  It was therefore not an abuse of discretion for the court to consider all three allegations of sexual contact when setting Seamon's basic sentence for unlawful sexual contact.  Moreover, any error in the court's recitation of the timing of the incidents was harmless.  *See* M.R.U. Crim. P. 52(a).

C.    SORNA

[¶27]  Seamon contends that the court erred by "ordering" Seamon to register as a sex offender pursuant to SORNA 2013, 34-A M.R.S.

§§ 11271-11304 (2016), instead of pursuant to SORNA 1999, 34-A M.R.S. §§ 11201-11256 (2016). The State concedes that Seamon should be classified as a lifetime registrant pursuant to SORNA 1999 and not as a Tier III registrant pursuant to SORNA 2013, but asserts that the sentencing court merely informed Seamon of his duty to register—which is not triggered until his release from prison.

[¶28] SORNA 1999 applies to an adult who was sentenced "for a sex offense or a sexually violent offense" on or after January 1, 1982. 34-A M.R.S. § 11202. A "sexually violent offense" includes unlawful sexual contact pursuant to 17-A M.R.S. § 255-A(1)(E-1) and requires lifetime registration. 34-A M.R.S. § 11203(7)(A), (8)(A).

[¶29] SORNA 2013 applies to a person who has committed certain criminal conduct after January 1, 2013, and is sentenced for that conduct after January 1, 2013. 34-A M.R.S. § 11272(1). Unlawful sexual contact pursuant to 17-A M.R.S. § 255-A(1)(E-1) is categorized as a "Tier III" offense, which requires lifetime registration. 34-A M.R.S. §§ 11273(16)(A), 11285(5).

[¶30] Registration as a sex offender is not a component of a criminal sentence; rather, registration is a duty imposed statutorily upon a defendant because of a conviction for a sex offense. *See* 34-A M.R.S. §§ 11222, 11282;

*Hunt*, 2016 ME 172, ¶ 42 n.14, 151 A.3d 911 ("[Defendant]'s sex offender registration is governed by [SORNA 2013]. . . . Sex offender registration is a consequence that applies to a convicted sex offender because of his conviction, and it is a consequence that may affect an offender far longer than his prison sentence."); *State v. Carter*, 2016 ME 157, ¶ 4 n.1, 150 A.3d 327 ("As a result of this conviction, [defendant] is also required to register on the State's sex offender registry for ten years.").

[¶31]  As the State concedes, Seamon should have been notified of his duty to register pursuant to SORNA 1999—not SORNA 2013.  Our opinion, therefore, serves as notification to Seamon and all interested parties that he will be required to register as a lifetime registrant pursuant to SORNA 1999 upon his release from incarceration.

The entry is:

Judgment and sentence affirmed.

---

Caitlin Ross Wahrer, Esq. (orally), Chester & Vestal, P.A., Portland, for appellant Andrew L. Seamon

Maeghan Maloney, District Attorney, and Kristin Murray-James, Asst. Dist. Atty. (orally), Prosecutorial District IV, Augusta, for appellee State of Maine

Kennebec County Superior Court docket number CR-2014-656