MAINE SUPREME JUDICIAL COURT          Reporter of Decisions
Decision:     2026 ME 37
Docket:       Cum-25-84
Argued:      December 9, 2025
Decided:      April 23, 2026

Panel:        STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

JACOB MILLER

DOUGLAS, J.

[¶1]  Jacob Miller, now known as Jaydè Miller,[1] appeals from a judgment of conviction for domestic violence aggravated assault (Class B), 17-A M.R.S. § 208-D(1)(D) (2021),[2] entered by the trial court (Cumberland County, *Lipez, J.*) upon Miller's plea of guilty, sentencing Miller to seven years in prison with all but four years suspended and imposing three years of probation.  Miller argues that the court violated her due process rights at sentencing by relying upon facts asserted by the victim while not under oath or subject to

---

[1] Miller uses she/her pronouns.

[2] This statute has been amended since May 12, 2021, the date of the crime.  *See, e.g.*, P.L. 2023, ch. 465, § 4 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 208-D(1)(D) (2026)).

2

cross-examination and upon an unsworn report of an expert who also was not subject to cross-examination.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  On May 14, 2021, the State of Maine filed a complaint against Miller, charging her with four crimes based on incidents alleged to have occurred on May 12, 2021: domestic violence aggravated assault (Class B), 17-A M.R.S. § 208-D(1)(D); domestic violence criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. § 209-A(1)(A) (2021);[3] 17-A M.R.S. § 1604(5)(A) (2025); domestic violence assault (Class D), 17-A M.R.S. § 207-A(1)(A) (2021);[4] and criminal restraint (Class D), 17-A M.R.S. § 302(1)(B)(1) (2026).  A grand jury indicted Miller on the same four crimes on June 11, 2021.  The grand jury returned a superseding indictment on August 5, 2021, adding a charge for attempted murder (Class A), 17-A M.R.S. §§ 152(1)(A), 201(1)(B) (2026).

[¶3]  As the result of a March 2023 settlement conference, Miller agreed to plead guilty to domestic violence aggravated assault (Class B), 17-A M.R.S.

---

[3]  This statute has been amended since May 12, 2021, the date of the crime.  *See, e.g.*, P.L. 2023, ch. 465, § 7 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 209-A(1)(A) (2026)).

[4]  This statute has been amended since May 12, 2021, the date of the crime.  *See, e.g.*, P.L. 2023, ch. 465, § 2 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 207-A(1)(A) (2026)).

§ 208-D(1)(D), with all other charges being dismissed and the sentence to be contested.

[¶4]    Prior to a combined plea and sentencing hearing on January 24, 2025, *see* M.R.U. Crim. P. 11, 32, both parties filed legal memoranda with attachments.  Miller's submission included thirteen exhibits: six letters of support, six articles regarding the treatment of transgender individuals in prison, and one white paper on the science of late adolescence.  The State's memorandum had one attachment: an expert report from a doctor who evaluated and opined on "the [victim's] injuries, the injury mechanisms, the forensic and medical issues, and the medical facts."

## A.    Plea Proceeding Under Rule 11 of the Maine Rules of Unified Criminal Procedure

[¶5]   During the plea proceeding held to ensure compliance with the requirements of Rule 11 of the Maine Rules of Unified Criminal Procedure, the court asked the State to recite the facts it had intended to prove at trial to establish that Miller committed domestic violence aggravated assault.[5]   In

---

[5] "A person is guilty of domestic violence aggravated assault if that person . . . [v]iolates section 208, subsection 1, paragraph C and the victim is a family or household member as defined in Title 19-A, section 4002, subsection 4.  Violation of this paragraph is a Class B crime."  17-A M.R.S. § 208-D(1)(D).  A person violates section 208(1)(C) if that person "intentionally, knowingly or recklessly causes . . . [b]odily injury to another under circumstances manifesting extreme indifference to the value of human life.  Such circumstances include . . . the use of strangulation.  For the purpose of this paragraph, 'strangulation' means impeding the breathing or circulation of the blood of another person by intentionally, knowingly or recklessly applying pressure on the person's throat or neck."

4

summarizing its evidence, the State indicated that the victim had reported at the scene that Miller had strangled her and then in later statements provided further details about the assault, which she said occurred over a period of time and included repeated incidents of strangulation.[6]

[¶6]  The court asked Miller whether the summary was "consistent with the discovery that [Miller had] received in th[e] case."  Miller, through counsel, responded that it was consistent with the discovery but added:

> If I can just put a couple of things on the record? . . . [The victim] gave multiple statements over the course of months.  And I just want to be clear that the version of events that she provided in the

---

17-A M.R.S. § 208(1)(C) (2026).  For purposes of section 208-D, the definition of "family or household members" includes "individuals presently or formerly living together and individuals who are or were sexual partners."  19-A M.R.S. § 4002(4) (2021), *repealed and replaced by* P.L. 2021, ch. 647, §§ A-2, A-3 (effective Jan. 1, 2023) (codified at 19-A M.R.S. § 4102(6) (2026)).

[6] In sum, the facts that the State represented it was prepared to prove at a trial in this matter were as follows.

As the victim reported at the scene of the incident, upon returning home at around 2:30 a.m. on May 12, 2021, Miller, her roommate, became angry because the victim had left vitamin bottles on the floor.  Miller then attacked her—biting her, bending her fingers back, and punching her.  Miller put her hands around the victim's throat and squeezed, causing difficulty with breathing and ultimately a loss of consciousness.

As the victim reported in subsequent statements, the initial assault occurred in their bedroom, where Miller attacked her, restrained her from leaving, and strangled her to the point of unconsciousness.  Upon regaining consciousness, the victim realized that Miller's hands were still around her neck but then lost consciousness a second time after Miller punched her, bit her, slammed her head into the floor, and strangled her.  When the victim regained consciousness again, she attempted to escape but was restrained and strangled again by Miller to the point of unconsciousness.  Finally, when the victim awoke for the third time, she was able to retrieve and then deploy pepper spray.  A struggle ensued in which the victim lost consciousness a fourth time after being strangled again, but she then awoke and was able to flee the apartment despite Miller's efforts to pursue her and drag her back inside.  She ran into a parking lot and screamed for help, which prompted a neighbor to call 9-1-1.  EMS personnel evaluated the victim and then transported her to the hospital.

moment back on May 12th, 2021, that is the version of events that my client is admitting to, accepting responsibility for.

Miller's counsel indicated further:

A lot of the other statements that were made would have been fully contested ha[d] this case gone to trial. But we do consent to the, I guess, the first version of the allegations, and we agree that those are sufficient to establish the crime of aggravated assault as charged.

[¶7] In response, the court clarified:

I want to make sure that your client understands that if we proceed with the guilty plea and get to sentencing, that . . . I will have the ability to make my own fact . . . findings and might decide to accept the version of events that the State just made.

Upon the court's inquiry, Miller's counsel confirmed that counsel had discussed this possibility with Miller and that Miller understood. The court proceeded with the Rule 11 proceeding and ultimately accepted Miller's plea.

## B. Sentencing

[¶8] Immediately following entry of the plea, the court turned to sentencing. The State recommended a sentence of ten years, with all but six years suspended, and three years of probation. The State focused on the seriousness of the conduct and indicated that it would have offered evidence of four separate incidences of strangulation. The court asked the State for its position on the dispute about the number of strangulation incidents, and the

6

State argued that Miller had, by pleading guilty, acceded to the version of events that the State had outlined.

[¶9]   The victim appeared at the sentencing hearing in person and reported the effects of the assault on her physical and mental health, place of residence, and educational and vocational trajectory.  She stated that Miller had "strangled and beaten [her] for hours."  She described Miller as preventing her from leaving several times, strangling her on the floor, and chasing her after she struggled free and got outside.

[¶10]   Miller, through counsel, acknowledged the victim's pain and indicated that she would not "spend the Court's time picking apart details or things like that" because Miller did not think it was necessary to do so.  Miller advanced several mitigating factors, including her success in obtaining treatment, housing, and employment; her lack of criminal history; her young age of twenty-one at the time of the offense; and her acceptance of responsibility.  She requested a fully suspended sentence that would avoid mistreatment in jail as a transgender person and would keep her on the positive trajectory that she had established while out on bail.

[¶11] Miller then personally addressed the court to express that she was "disgusted and terrified" by her former self, had since obtained appropriate

diagnoses and treatment, and had maintained sobriety and built a career. Through counsel, she argued for a three-year sentence, with all but the fourteen days that she had already served suspended, and three years of probation. The State challenged that proposal as ignoring the seriousness of the crime.

[¶12] The court undertook the required three-step process for determining the sentence. *See* 17-A M.R.S. § 1602(1) (2026).[7] In the first step, to determine the basic sentence based on the nature and seriousness of the

---

[7] This statute codifies our holding in *State v. Hewey*, 622 A.2d 1151, 1154-55 (Me. 1993). Specifically, the statute provides,

> In imposing a sentencing alternative pursuant to section 1502 that includes a term of imprisonment for a Class A, Class B or Class C crime, in setting the appropriate length of that term as well as any unsuspended portion of that term accompanied by a period of probation or administrative release, the court shall employ the following 3-step process.
>
> **A.** First, the court shall determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the individual.
>
> **B.** Second, the court shall determine the maximum term of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case. Relevant sentencing factors include, but are not limited to, the character of the individual, the individual's criminal history, the effect of the offense on the victim and the protection of the public interest.
>
> **C.** Third, the court shall determine what portion, if any, of the maximum term of imprisonment under paragraph B should be suspended and, if a suspension order is to be entered, determine the appropriate period of probation or administrative release to accompany that suspension.

17-A M.R.S. § 1602(1). The statute was recently amended, after the court's sentencing, to also require consideration of "the age of the individual at the time the conduct forming the basis for the conviction occurred" at step two of the sentencing process. P.L. 2025, ch. 420, § 1 (to be codified at 17-A M.R.S. § 1602(1)(B)).

8

crime as committed, the court determined that it was necessary for it to make findings, stating,

> There's some disagreement of the nature of the assault, and I am entitled in determining the facts to rely on any—to consider any reliable information. And I've reviewed what's been provided to me and in particular the expert report that the State has provided, which incorporates a bunch of [the victim]'s statements as well as a review of medical records and the like.

Miller lodged no objection to the court's consideration of the expert report.

[¶13] The court then found the following facts about the crime, all of which are supported by information provided at sentencing and consistent with the State's offer of proof at the Rule 11 proceeding:

- On May 12, 2021, Miller assaulted the victim, whom she had met recently and with whom she had had a brief sexual relationship.

- Miller became angry at the victim for leaving vitamin bottles on the floor.

- According to the victim, Miller strangled her to the point of unconsciousness four separate times. Each time, the victim was unable to breathe, and the blood flow to her brain was impeded.

- Miller also slammed the victim's head into the ground, bit the victim, and prevented the victim from escaping or calling the police for help.

- The victim had to use pepper spray to defend herself. Ultimately, the victim was able to flee to the parking lot.

- Miller followed her, and the assault ended only when neighbors heard the victim screaming for help, intervened, and called 9-1-1.

- Miller fled and was located by police a short time later.

[¶14]  The court further found that the doctor's expert report indicated that the medical records and other documentation in the case were consistent with multiple near-fatal strangulations that created a grave risk of death.  The report documented injuries that include an anoxic brain injury, a traumatic brain injury or concussion, petechial hemorrhages, contusions, abrasions, and human bites on both arms.

[¶15]  The court thus found that the assault "was a brutal, senseless, and completely unprovoked act of violence."  It viewed the assault as being "among the more serious ways this offense can be committed" and set the basic sentence at eight years.[8]  *See* 17-A M.R.S. § 1602(1)(A).

[¶16]  In the second step, the court considered the aggravating factors of the physical and mental impact on the victim, and the mitigating factors, set forth in Miller's sentencing memorandum, of Miller's acceptance of responsibility, remorse, appreciation of the wrongfulness of the assault, lack of criminal history or other similar incidents, youth at the time of the crime, tragic childhood, previous head traumas, health problems, substance use disorder, and significant rehabilitation since the time of the crime.  The court concluded

---

[8]  The maximum sentence for a Class B crime is ten years.  *See* 17-A M.R.S. § 1604(1)(B) (2026).

10

that the mitigating factors slightly outweighed the aggravating factors and determined a maximum term of imprisonment of seven years. *See id.* § 1602(1)(B).

[¶17] In step three, the court determined that Miller was a good candidate for probation but that a period of incarceration was warranted because of the seriousness of the assault. The court established a final sentence of seven years, with all but four years suspended, and three years of probation. *See id.* § 1602(1)(C).

[¶18] Miller timely filed a notice of appeal and applied for leave to appeal the propriety of her sentence. M.R. App. P. 2B(b)(1), 20(b). The Sentence Review Panel denied Miller's application for sentence review. *See* M.R. App. P. 20(f); *State v. Miller*, No. SRP-25-85 (Me. Sent. Rev. Panel Apr. 7, 2025).

## II. DISCUSSION

[¶19] Miller contends that the court erred in its determination of an eight-year basic sentence in step one of the prescribed sentencing analysis by "rel[ying] on contested facts alleged by the prosecution during the Rule 11 [proceeding] and [by] explicitly rel[ying] on sections of an expert report that was submitted as an exhibit to the prosecution's sentencing memorandum."

The principal thrust of Miller's argument is that the court "deprived [her] of due process" because the court could not "make its own determination of what [was] 'reliable' when there [were] sincere questions regarding the factual recitation provided to the court" and there was "no opportunity to cross examine or challenge the proffered evidence."[9]

## A.    Standard of Review

[20]  The Sentence Review Panel having denied Miller's application for sentence review, she is challenging the legality—not the propriety—of her sentence in this direct appeal. *See State v. Bennett*, 2015 ME 46, ¶ 14, 114 A.3d 994.   We review de novo any asserted constitutional violations or misapplication of legal principles with respect to the determination of a basic sentence. *See State v. Jones*, 2012 ME 126, ¶ 35, 55 A.3d 432 ("Our review of an alleged constitutional violation is de novo."); *State v. Plummer*, 2020 ME 143, ¶ 10, 243 A.3d 1184 ("We review de novo for misapplication of principle the basic sentence imposed at the first step of the analysis . . . ." (quotation marks omitted)).

---

[9]  Although Miller references the Due Process Clause in article I, section 6-A of the Maine Constitution, we confine our review to her argument under the federal constitution because she did not sufficiently develop the state constitutional argument before the trial court or on appeal to us. *See State v. Norris*, 2023 ME 60, ¶ 33, 302 A.3d 1.

[¶21]  Nonetheless, if an issue was not raised in the trial court and is therefore unpreserved, we review only for obvious error.  *State v. Burdick*, 2001 ME 143, ¶¶ 12-13, 782 A.2d 319.  "Error is obvious when there is (1) an error, (2) that is plain, and (3) that affects substantial rights.  If these conditions are met, we must also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings before we vacate a judgment on the basis of the error."  *State v. Goncalves*, 2025 ME 70, ¶ 43, 340 A.3d 639 (quotation marks omitted).

[¶22]  Here, despite Miller's suggestion to the contrary, she did not raise a specific objection *at sentencing* to the State's (or the victim's) version of the events that included the later-reported, additional incidents of strangulation.  Rather, as noted above and discussed further below, *see supra* ¶ 10; *see infra* ¶ 29, defense counsel simply stated that Miller was "not going to spend the Court's time picking apart details or things like that" because she did not think it was necessary.  Nor did Miller object to the State's submission of the doctor's report.  In these circumstances, we consider the issues to be unpreserved and review for obvious error.  *See Burdick*, 2001 ME 143, ¶¶ 12-13, 782 A.2d 319.

**B.      Requirements of Due Process Satisfied**[10]

[¶23]   Courts have wide discretion in determining what information to consider in sentencing, "limited only by the due process requirement that such information must be factually reliable and relevant." *State v. Witmer*, 2011 ME 7, ¶ 20, 10 A.3d 728 (quotation marks omitted); *see State v. Seamon*, 2017 ME 123, ¶ 24, 165 A.3d 342; *State v. Rosa*, 575 A.2d 727, 730 (Me. 1990); *State v. Dumont*, 507 A.2d 164, 166-67 (Me. 1986); *see also United States v. Curran*, 926 F.2d 59, 61 (1st Cir. 1991) ("It is well settled . . . that a defendant has a due process right to be sentenced upon information which is not false or materially incorrect.").

[¶24]   "Factual reliability is assured in various ways." *Dumont*, 507 A.2d at 166.  Thus, we have "decline[d] to adopt a *per se* rule" or prescribe a specific procedure that sentencing courts must follow in order to make a reliability determination.  *Id.* at 167.  A sentencing court "is in a better position to

---

[10] In connection with her due process argument, Miller suggests in summary fashion that the court violated her rights under the Sixth Amendment's Confrontation Clause.  We decline to address this issue because Miller has not adequately developed the argument in her brief.  *See State v. Thomas*, 2025 ME 34, ¶ 49 n.27, 334 A.3d 686.  We note, however, the weight of federal authority holding that the right of confrontation does not restrict a court's consideration of hearsay at sentencing.  *See United States v. Bras*, 483 F.3d 103, 109 (D.C. Cir. 2007) (holding—consistent with other federal circuits—that even after the United States Supreme Court held, in *Crawford v. Washington*, 541 U.S. 36, 68 (2004), that testimonial statements may not be admitted *at trial* absent witness "unavailability and a prior opportunity for cross-examination," the admission of hearsay at sentencing does not violate the right of confrontation).

14

determine what procedures to use to ensure [the] reliability" of the information presented, *State v. Whitten*, 667 A.2d 849, 852 (Me. 1995), and thus "has broad discretion to determine what procedure, if any, is necessary to ensure that the [information is] factually reliable," *Dumont*, 507 A.2d at 167; *see id.* at 166-68 (stating that "[i]nformation marshalled by a probation officer in a pre-sentence report is presumed to be reliable" and finding no error where, over the defendant's objection, the sentencing court relied on affidavits describing uncharged conduct);[11] *see also Seamon,* 2017 ME 123, ¶¶ 25-26, 165 A.3d 342 (holding that the sentencing court did not err in considering conduct that was the subject of a charge on which the jury could not reach a verdict); *Rosa,* 575 A.2d at 730 (upholding the court's reliance on a forensic report with alleged factual inaccuracies and a presentence report summarizing uncharged conduct where defendant "ha[d] the opportunity to challenge the information in both

---

[11] Our decision in *State v. Dumont* followed from the United States Supreme Court's seminal decision in *Williams v. New York*, 337 U.S. 241 (1949). *See Dumont*, 507 A.2d at 166 (citing *Williams*). In *Williams*, the Court held that there was no due process violation when a court considered, along with information provided by the defendant, the contents of a probation officer's report, where the defendant had not sought to refute or discredit the report's contents by cross-examining the officer in open court. 337 U.S. at 244-45, 249-50. The Court indicated that "both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Id.* at 246. It noted that "modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial," *id.* at 247, and warned of the potential that allowing a broad right to cross-examine sentencing information could "endlessly delay criminal administration in a retrial of collateral issues." *Id.* at 250.

reports at the sentence hearing" and after doing so, the sentencing justice "was able to evaluate appropriately the report[s] for sentencing purposes").

[¶25]   When a defendant challenges the accuracy or reliability of information that a court considered in its sentencing analysis, we examine the record to determine whether, consistent with due process, the defendant was afforded an opportunity to contest the facts or present an alternate version of events, *see id.*, and then ultimately whether the sentencing judge relied on inaccurate, unreliable, or questionable information, *see Goncalves*, 2025 ME 70, ¶ 45, 340 A.3d 639; *cf. State v. Servil*, 2025 ME 73, 340 A.3d 630 (concluding that the court erred in considering an obituary for the victim that neither party had presented to the court, where the defendant had no opportunity to respond to the obituary's contents before the court entered its sentence).  In *Goncalves,* for example, the sentencing court found, without any support in the sentencing record, that the defendant had assaulted a third party while he was committing the crime.  2025 ME 70, ¶ 42, 340 A.3d 639.  We vacated the resulting sentence and remanded the matter for resentencing without consideration of that inaccurate fact as an aggravating factor.  *Id.* ¶¶ 44, 49-51.  There, the conviction resulted from a jury-waived trial, and the State agreed that the challenged finding lacked support.  *See id.* ¶¶ 15, 42, 44.

[¶26] Here, there is no basis in the record to conclude that the court relied on inaccurate or unreliable information, other than Miller's general disagreement voiced at the Rule 11 proceeding—a view that the State strongly contested. From a due process perspective, the pivotal question is whether Miller was deprived of an opportunity to test the validity or reliability of the facts upon which the court relied at sentencing. We conclude that she was not.

### 1. Reliance on the Victim's Statements

[¶27] Miller challenges the court's reliance on "allegations that were neither consented to nor adjudicated by any factfinder." She argues that the victim's statements made after the day of the events, both to the police and to the court, indicating that she had been strangled multiple times, were neither corroborated nor tested through cross-examination.

[¶28] At the Rule 11 proceeding, when Miller indicated that she was agreeing only to the victim's initial report involving a single assault, the court specifically confirmed that Miller understood that if the court proceeded with the guilty plea and reached sentencing, the court would "have the ability to make [its] own fact . . . findings and might decide to accept the version of events the State just made." Then at sentencing, the State again asserted four separate instances in which Miller strangled the victim, indicating that had there been a

trial, the victim would have testified to that effect. The victim, who was present at sentencing, recounted her version of the offense in considerable detail, corroborating the version offered by the State.

[¶29] For her part at sentencing, Miller did not object to the victim's version, did not request that the victim be placed under oath, did not request an opportunity to cross-examine the victim, and did not present an alternative version of the events. Nor did she seek a continuance to gather more information or witnesses. She simply replied that she was "not going to spend the Court's time picking apart details" of the State's version.

[¶30] Miller's decision not to contest the victim's statements affected the scope of what the court had before it to consider and the court's determination regarding the reliability of the information it had received. *See State v. Soucy*, 2006 ME 8, ¶ 16, 890 A.2d 719 ("[T]he State offered to present the sworn testimony of the victim of the uncharged conduct and subject her to cross-examination. When [the defendant] waived the opportunity for the information to be provided in that format, the court was warranted in accepting the unsworn statements as factually reliable."). Thus, the information before the court about what happened included only the victim's account of the events and no contrary version from Miller or anyone else.

[¶31] The court acted well within its discretion. It specifically informed the parties how it would reach its findings and allowed each to present relevant information at the sentencing hearing. Miller had the "opportunity to deny or explain information considered in determining the appropriate sentence," *State v. Hardy*, 489 A.2d 508, 512 (Me. 1985), and did not avail herself of that opportunity, *see In re Involuntary Commitment of M.*, 2020 ME 99, ¶ 17, 237 A.3d 190 ("A litigant is not denied due process if she fails to take advantage of available procedural mechanisms that are designed to protect against an erroneous deprivation of life, liberty, or property."). We conclude that the court did not commit obvious error in considering the information from the victim reliable for purposes of determining the basic sentence. In the circumstances here, no additional process was due.

### 2. Reliance on the Expert Report

[¶32] Miller also contends that the court erred by relying upon the expert medical report offered by the State because she had no opportunity to cross-examine the author about the report's contents, including the version of events upon which the expert based his opinion.

[¶33] The process employed was adequate for the court to assess the reliability of the information. Miller, despite having received the expert's

report before the sentencing, presented nothing in opposition and did not move to continue the sentencing or seek to cross-examine the authoring doctor when the State offered the report. As a result, the court had to consider whether the report's contents alone demonstrated its reliability.

[¶34] A sentencing court may consider a statement from a victim's physician about the consequences of the crime. *See State v. Fleming*, 644 A.2d 1034, 1036 (Me. 1994) ("The crime's impact on the victim is a relevant consideration in sentencing, and statements by the victim's . . . physician [is] factually reliable information to help gauge that impact." (citation omitted)). Although the doctor here did not personally treat the victim, he reviewed her medical records and other sources of information, lending support to the reliability of his report. Specifically, the material facts in his report were based on sources including the emergency responders' report, the victim's medical records, the police investigative file, body-worn camera footage, 9-1-1 calls, a police interview of the victim, a personal interview of the victim, and photographs of the victim's injuries. The report was further corroborated by both the victim's own statements at sentencing and the photographs that were included in the report.[12]

---

[12] Other jurisdictions have opined that "sufficient corroboration by other means" may help support a determination of reliability. *United States v. Fatico*, 603 F.2d 1053, 1054-55 (2d Cir. 1979)

20

[¶35]  Even if the court had erred in considering the report without undertaking additional processes to test its reliability, however, Miller has not specified what aspects of the report she would challenge if given the opportunity, other than to reiterate her general disagreement with the number of instances of strangulation that the victim reported.  In these circumstances, the court did not commit obvious error in determining that the report was sufficiently reliable for consideration at sentencing, including for purposes of determining the basic sentence, and its consideration of the report did not violate Miller's due process rights.  *See Williams v. New York*, 337 U.S. 241, 249-50 (1949).

The entry is:

Judgment affirmed.

---

Tina Heather Nadeau, Esq. (orally), The Law Office of Tina Heather Nadeau, PLLC, Portland, for appellant Jacob Miller

Jacqueline Sartoris, District Attorney, and Kristen M. Hughes, Asst. Dist. Atty. (orally), Cumberland County District Attorney, Portland, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2021-1947
FOR CLERK REFERENCE ONLY

---

(quotation marks omitted); *see also* 6 Wayne R. LaFave, *Criminal Procedure* § 26.4(f) at 1517 (5th ed. 2025) (stating that hearsay information may be established as reliable through corroborating evidence).